IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

DOCKET NO. 3:04-CV-574-W

| | |
|---|---|
| JIMMY W. CUPPLES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| AMSAN, LLC d/b/a MAINTENANCE ) | ORDER |
| SUPPLY COMPANY, AMERICAN ) | |
| SANITARY INCORPORATED, GRACE ) | |
| CAUDLE, and TENA DAVIS, ) | |
| ) | |
| Defendants. ) | |
| ) | |

THIS MATTER comes now before the Court for decision on defendants' motions for summary judgment (Doc. Nos. 16, 19), following a motions hearing held 27 September 2006 and supplemental briefing at the request of the Court. For the reasons set forth below, the Court finds summary adjudication appropriate on the present record and grants summary judgment in favor of all defendants on all claims.

## BACKGROUND

This civil action brings claims for employment discrimination pursuant to the Age Discrimination in Employment Act ("ADEA") and Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), as well as pendent state law claims against the individual defendants for tortious interference with contract and defamation.

Plaintiff Jimmy Cupples filed this lawsuit against his former employer, AmSan, LCC ("AmSan"), AmSan's parent holding company, American Sanitary Incorporated ("ASI"), and two

former co-workers, Grace Foure (formerly Grace Caudle) and Tena Davis, following termination from his position of Sales Manager on 5 August 2004. Cupples was 62 years old and had been employed by AmSan for nearly 30 years at the time of his discharge. Cupples was terminated after Foure accused him of sexual harassment

The facts as viewed in the light most favorable to Cupples can be summarized as follows. On 6 July 2004, defendant Grace Foure reported to AmSan's general manager, Jim Core, an alleged incident of sexual harassment, claiming that Cupples pinched her buttocks and then said "I just had to do that." (Core Depo. at 48.) Cupples admits to touching Foure but claims that he accidentally bumped her with his briefcase. (Cupples Depo. at 58.) Foure also told Core that she had previously gone to speak with Cupples after some other co-workers made lewd comments about her breasts, and that Cupples had responded by telling her that she was a nice-looking woman and that she should just keep herself from being in those situations. (Id. at 48, 54-55.) Plaintiff admits the encounter but claims to have disciplined the offending employee. (Id. at 51.) However, the employee in question has no recollection of being disciplined and there was no record of disciplinary action in his personnel file. (Collins Decl. ¶ 12.)

Core reported the complaint up the ladder to AmSan's human resources director, Terrance Collins, who then began an investigation into the allegations. In a subsequent interview by Collins, Foure claimed (in addition to the conduct described above) that Cupples had made inappropriate comments of a sexual nature to her in the past[1] and occasionally would rub or massage her shoulders. (AmSan's Am. Resp. to Pl's Interrogs., No. 1; Foure Depo. at 38.) Also, another female employee (Davis) reported that Cupples had on various occasions inappropriately touched her on the buttocks,

---

[1] Such as "your butt looks good in those jeans" and "you sure keep an old man's heart pumping."

2

massaged her shoulders, goosed her on the side, and made comments which made her feel uncomfortable.[2] (AmSan's Resp. to Pl's Interrogs., No. 3.) Davis had previously reported (in confidence) one of these incidents of inappropriate touching to Core, but no formal complaint was lodged because Davis wanted to handle the situation on her own. (Core Depo. at 79-80; Davis's Resp. to Pl's Interrogs., No. 5.) Finally, during the investigation, two other women reported that Cupples had touched them inappropriately on various prior occasions. (AmSan's Am. Resp. to Pl's Interrogs., No. 1.) Cupples admits generally to casual touching and making innocent comments but denies that any of this conduct was ever inappropriate. (Cupples Depo. at 125-27.)

While the investigation was ongoing, Core instructed Cupples per the company's confidentiality policy not to discuss any part of the investigation with other employees and specifically not to talk further with Foure. (Core Depo. at 73-74.) Nonetheless, Cupples admits to speaking with both Foure and Davis about the investigation.[3] (Cupples Depo. at 74, 76-77, 116.) At the conclusion of the investigation, AmSan executives decided to demand Cupples's resignation for breaching its anti-harassment policy, confidentiality policy, and failing to obey Core's instruction not to discuss the investigation.

The crux of Cupples's theory of the case is that the allegations of sexual harassment are false. In support of this contention, Cupples relies on his own denial of Foure's account of events, the testimony of numerous employees who establish that casual hugging and touching was a routine and tolerable element of the workplace environment at AmSan (Montgomery Depo. at 12-14; Nelson

---

[2] Such as "you look sexy today" and "that outfit looks really good on you."

[3] Less than twenty-four hours after learning of the complaint, Cupples approached Foure to apologize for doing or saying anything inappropriate and to implore her not to take things further.

Depo. at 17-18; Sutton Depo. at 17), and the deposition testimony of a co-worker, Marvin Sutton, who states that immediately after Foure was shown a sexual harassment training video, she made a comment about knowing how to "get even" with co-workers who make her mad (Sutton Depo. at 12-13).

Cupples also argues that Collins' investigation was inadequate, implying that Foure's complaint provided AmSan with pretextual grounds for firing him. Specifically, Cupples complains that Collins did not interview enough people concerning the incident and failed to "find out what kind of person" he really is. (Cupples Depo. at 143-48.) Sutton testified that he and others around the company espoused the belief that the investigation had been inadequate and that Cupples was being set up.[4] (Id. at 26-27.) And H.V. Nelson, a member of AmSan's management and former owner of the company, opined that the decision to terminate Cupples was "pre-determined" and that "economics" was a motivating factor. (Nelson Depo. at 43-45.)

Finally, Cupples asserts that since 1998 (the year of AmSan's acquisition of the Maintenance Supply), AmSan has "systematically terminated" on "pretextual grounds" more than forty employees over fifty years of age in order to reduce costs. The evidence plaintiff actually has of this is not so impressive – Nelson testified that, since AmSan's acquisition of the company, 40 or so employees had been laid off, and that most of them had been older, but that this was simply a consequence of the fact that the company's sales force was primarily older in age. (Nelson Depo. at 27.) Nelson also testified about older (over age fifty) employees across AmSan's various component companies who he believed to have been "forced out," but could offer no concrete explanation as to whether this was

---

[4] On cross-examination Sutton admitted having no concrete evidence of a set-up. (Sutton Depo. at 33.)

a result of general downsizing, poor work performance, or a pattern of age discrimination. (Nelson Depo. at 48-62.) Nelson did testify, however, that the cost of employing older workers was an issue that was discussed during management-level meetings. (Nelson Depo. at 62.) This is corroborated by the affidavit testimony of two former AmSan executives who verify that they were present at meetings where management voiced concerns about the payroll and health insurance costs of employing older workers and commented that the company should look for opportunities to "weed out" older workers. (Taormina Aff. ¶ 5; Lange Aff. ¶ 3.) AmSan attacks the relevance of this testimony, noting that these alleged meetings took place more than two years prior to Cupples's termination and involved a management team that had since been replaced by a new vanguard of executives.

**ANALYSIS**

**I.  Standard of Review**

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In making its determination, the Court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences. Bailey v. Blue Cross & Blue Shield of Virginia, 67 F.3d 53, 56 (4th Cir. 1995). A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "set forth specific facts showing that there is a

5

genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e)). A mere "scintilla" of evidence is insufficient to create a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). However, if reasonable minds could differ as to the import of the evidence, it is the jury's province to assess the weight or credibility of conflicting evidence and summary judgment is inappropriate. Id. at 250.

## II. Employment Discrimination – ADEA

The motion now under consideration presents two important and relatively unsettled issues in the area of employment discrimination law: First, under what circumstances (if any) can an older employee who is discharged following an accusation of misconduct (whether true or false) maintain an action for wrongful termination under the ADEA? And second, has the plaintiff in this case, Jimmy Cupples, in fact presented sufficient evidence to create a triable question of material fact as to whether his termination was motivated by his age as opposed to some other, permissible factor?

### (A) *Available Methods of Proof in Age Discrimination Cases*

An employment discrimination claim can be proven either directly or indirectly through the well-known McDonnell Douglas burden-shifting scheme. A plaintiff may establish discrimination directly by showing that (1) he was an employee covered by the ADEA; (2) who suffered an unfavorable action by an employer covered by the ADEA; and (3) age was a determining factor in the employment decision. EEOC v. Clay Printing Co., 955 F.2d 936, 941 (4th Cir. 1992). However, in a "mixed motive" case such as this arguably would be, a plaintiff need only show that age was a motivating factor, but not necessarily the sole motivating factor, in the employment decision. This shifts the burden of persuasion to the defendant to show that it would have made the same decision

6

even in the absence of any discriminatory motive.  EEOC v. Warfield-Rohr Casket Co., 364 F.3d 160 (4th Cir. 2004).

By contrast, under the McDonnell Douglas pretext analysis, a plaintiff carries an initial burden of establishing only a prima facie case of discrimination, typically by showing that (1) he is a member of the protected age group (over the age of forty); (2) he was discharged; (3) he was performing his job at a level that met his employer's legitimate expectations; and (4) following his termination, he was replaced by a substantially younger employee.  Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996).  Once a plaintiff proves a prima facie case, the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action, upon which occasion the burden of persuasion shifts back to plaintiff to show that defendant's proffered reason is pretext for discrimination.  Id.  "To make this demonstration, the employee must show that as between the plaintiff's age and the defendant's explanation, age was the more likely reason for the dismissal, or that the employer's proffered explanation is simply 'unworthy of credence.'"  Id.

**(B)** *Direct vs. Circumstantial Evidence and the Mixed Motive Method of Proof*

As to the mixed motive analysis, AmSan asserts that none of Cupples's evidence is "direct" evidence of age discrimination because it does not squarely implicate the actual decision makers involved in Cupples's termination: AmSan's current CEO Michael Mulhern and Human Resources Director Terrance Collins.  In support of its motion for summary judgment, AmSan asks the Court to adopt as law Fourth Circuit dictum which suggests that "direct" evidence of discrimination is necessary to maintain a mixed motive case under the ADEA and that a case built on circumstantial evidence of discrimination may only proceed under the McDonnell Douglas burden-shifting scheme.

7

See Mereish v. Walker, 359 F.3d 330, 339-40 (4th Cir. 2004). However, it is by no means certain that the Fourth Circuit will ultimately embrace this position when it decides the question, since such a holding would be in tension with the approach now taken by the Supreme Court in Title VII cases, see Desert Palace v. Costa, 539 U.S. 90 (2003) (allowing a mixed motive case to proceed on the basis of circumstantial evidence only), and contrary to published judicial decisions from this circuit and elsewhere incorporating Desert Palace into the ADEA jurisprudence.[5] The Court delayed issuing its decision in anticipation that this issue might finally be settled in a case recently on appeal, but again the Fourth Circuit declined to address it, finding alternative grounds upon which to resolve the case. Ruff v. Target Stores, Inc., 2007 WL 805827, at *10 (4th Cir. Mar. 14, 2007). Because the case at bar likewise can be resolved on more substantive and less uncertain grounds, the Court will assume for purposes of this case that direct evidence should not be required to make out a mixed motive case under the ADEA.

Moreover, the Fourth Circuit has recognized that evidence of a "company-wide intent to discriminate based on age" or to "replac[e] all old employees with younger ones" may be sufficient to sustain a "direct evidence" case of discrimination,[6] even though such a case appears to be built on an inference that a corporate culture or *per se* policy of discrimination infects any resulting employment decision. This vein of authority seems particularly germane to the case at bar, where Cupples has argued that AmSan's highest-level executives were engaged in a clandestine policy to

---

[5] See Rachid v. Jack In The Box, Inc., 376 F.3d 305, 310-12 (5th Cir. 2004); Estades-Negroni v. Associates Corp. of N. Am., 345 F.3d 25, 30 (1st Cir. 2003), vacated on reh'g, 377 F.3d 58 (2004); Rishel v. Nationwide Mut. Ins. Co., 297 F. Supp. 2d 854, 862-66 (M.D.N.C. 2003).

[6] Martin v. Alumax of South Carolina, Inc., 380 F. Supp. 2d 723, 729 (D.S.C. 2005) (citing Wilhem v. Blue Bell, Inc., 773 F.2d 1429, 1433 (4th Cir. 1985)).

8

weed out its older and more expensive employees on pretextual grounds.[7] While AmSan attempts to characterize these isolated statements at executive-level meetings as "stray remarks" entitled to negligible weight, such a determination requires additional context not discernable from the present record.[8] Thus, looking at the moment not to the quality of Cupples' evidence but only to its general character, the Court cannot conclude that Cupples should be foreclosed as a matter of law from proceeding on the basis of a mixed-motive theory of age discrimination.

**(C)** *Employee Misconduct and the Circumstantial Method of Proof*

Even if Cupples was foreclosed from proceeding on a mixed-motive theory, however, he could nevertheless rely upon circumstantial evidence and proceed under the McDonnell Douglas pretext framework, contrary to AmSan's argument that he cannot make out a prima facie case of discrimination because he appears to have violated AmSan's sexual harassment and confidentiality policies. Specifically, AmSan argues that Cupples cannot satisfy the third element of a traditional prima facie case under McDonnell Douglas, which requires a threshold showing that he was "performing his job at a level that met his employer's legitimate expectations." Burns, 96 F.3d at 731.

Two divergent schools of thought have emerged in the context of a rather perplexing

---

[7] To recapitulate, Cupples submitted testimony from three former management-level employees who attest that a former AmSan CEO, John Muthe, expressed concerns about the number of older persons employed by the company and the health care costs they posed. (Taormina Aff. ¶ 5; Lange Aff. ¶ 3; Nelson Depo. at 62:16-25.) Muthe allegedly commented at one meeting that "older workers should not be hired in the future" and that AmSan should "look for opportunities to weed out older workers and those more likely to contribute to high health insurance premiums." (Taormina Aff. ¶ 5.) Furthermore, the deposition testimony of H. V. Nelson establishes that no fewer than nine upper-level AmSan employees over the age of 50 were involuntarily terminated from AmSan's employ during the relevant time period. (Nelson Depo. at 49-61.)

[8] For example, were Muthe's statements a vague suggestion or an explicit directive?

9

situation that arises where, as here, an employee charges his employer with seizing upon an actual or perceived failure to meet legitimate job expectations as pretext for unlawful discrimination. The Fourth Circuit has taken a rigidly legalistic approach that declines to dilute the plaintiff's burden of fully establishing the "legitimate expectations" element of a prima facie case, even when failure to meet the employer's legitimate expectations is the nondiscriminatory reason given by the employer for the termination decision. Warch v. Ohio Casualty Ins. Co., 435 F.3d 510, 515-17 (4th Cir. 2006). This conclusion follows from the premise that the purpose of the prima facie case is to "create[] a presumption that the employer unlawfully discriminated against the employee" by "eliminat[ing] the most common nondiscriminatory reasons for the plaintiff's [termination]." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Certainly, under normal circumstances, a discharged employee who was not meeting an employer's legitimate expectations on the job should not be entitled to a legally sufficient presumption, rebuttable or otherwise, that the employment action taken against him was discriminatory (as opposed to merit-based) in character. Nor in this case can it credibly be argued that compliance with a corporate anti-harassment policy is not a "legitimate expectation" for an employer to have of its employees. Cf. Waggoner v. City of Garland, 987 F.2d 1160, 1164 (5th Cir. 1993) (noting that termination on the basis of allegations of sexual harassment is "on its face a legitimate and nondiscriminatory reason").

However, the Warch rule is open to the objection in cases such as this that the proof necessary to establish the legitimate expectations element begs the ultimate factual question at issue (*i.e.*, whether the employee's failure to live up to the employer's reasonable expectations was the genuine reason for termination or merely pretext for impermissible discrimination), thus improperly conflating the three distinct stages of the McDonnell Douglas analysis. As the United States

Supreme Court recognized in U.S. Postal Serv. v. Aikens, 460 U.S. 711 (1983), once a defendant "responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's [termination]," the threshold issue of whether the plaintiff in fact made out a prima facie case really "is no longer relevant" because any presumption that may arise from the plaintiff's prima facie showing "drops from the case." Id. at 714-15. Where Warch views the employer's evidence that the plaintiff was fired for not meeting job expectations as a near absolute bar to his day in court, Aikens takes the view that the plaintiff's case should be allowed to proceed, but to a "new level of specificity" at stage three of McDonnell Douglas where the plaintiff still retains the ultimate burden of proving discrimination. Id. at 715-16. Thus, to follow Warch and reject an employment discrimination claim on the basis of a plaintiff's failure to make out a prima facie case, where the defendant has proceeded to proffer a nondiscriminatory reason (which reason may also tend to negate the legitimate expectations element of the prima facie case), not only "unnecessarily evade[s] the ultimate question of discrimination *vel non*," id. at 714, but also risks premature invalidation of what ultimately might be a meritorious discrimination claim. Accordingly, the Sixth Circuit has held that "when assessing whether a plaintiff has met [his] employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." Cline v. Catholic Diocese of Toledo, 206 F.3d 651, 660-61 (6th Cir. 2000).

While the Court recognizes Warch as clear and binding authority in this circuit, the same considerations that led the Sixth Circuit to the conclusion it reached in Cline would render it a mistake to read Warch too broadly. Accord Warch, 435 F.3d at 516-17. The Supreme Court has repeatedly emphasized that McDonnell Douglas's prima facie case "was never intended to be rigid,

11

mechanized, or ritualistic," Furnco Const. Corp. v. Waters, 438 U.S. 567, 577 (1978), and the Fourth Circuit has explicitly recognized that the "legitimate expectations" prong of the traditional prima facie case is "less useful" in cases alleging a discriminatory *disciplinary* decision in which a plaintiff necessarily has failed to live up to his employer's legitimate expectations, Moore v. City of Charlotte, 754 F.2d 1100, 1105 (4th Cir. 2005). Thus, the Fourth Circuit has provided an alternative framework that must be applied to cases where an employee makes an allegation of discrimination in the context of a disciplinary employment action following employee misconduct. Specifically, the aggrieved employee may make out a prima facie case of discrimination by showing that (1) he is a member of a protected class (over the age of forty); (2) the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) he suffered more severe discipline for his misconduct as compared to employees outside the protected class. Taylor v. Virginia Union Univ., 193 F.3d 219, 234 (4th Cir. 1999).[9]

Neither Cupples nor AmSan has argued this case under the proper test as set forth in Taylor. While AmSan potentially could argue on these facts that Cupples cannot satisfy the test for a prima facie case of discriminatory discipline because his conduct was more serious than that of younger employees who may only have been suspended for violating the anti-harassment policy (in that allegations came to light which involved more than one instance of harassment toward more than one female coworker, or that he compounded his misconduct by breaching the confidentiality policy), neither of these conclusions is self-evident in the record. Moreover, Cupples submitted a minimally sufficient quantum of proof necessary to support a disparate discipline instruction to the

---

[9] An ADEA plaintiff proceeding under this McDonnell Douglas alternative also need not show that he was replaced by a substantially younger employee.

jury. As Morris Taormina (a former AmSan general counsel) testified by affidavit:

> In my professional experience, the termination of Jimmy Cupples was unprecedented at AmSan, and not warranted under the usual and customary application of AmSan's sexual harassment policy. During my tenure at AmSan, no one with the years of service of Jim Cupples was terminated after one complaint of sexual harassment. Typically, in my experience, the subject of a valid complaint would be suspended for an appropriate amount of time and/or required to obtain counseling.

(Taormina Aff. ¶ 6.) Accordingly, the Court concludes that AmSan has failed to carry its burden under Rule 56 of demonstrating an absence of facts supporting a prima facie case of discrimination.

### (D) *Plaintiff's Evidence Fails to Establish an ADEA Claim as a Matter of Law*

With these legal formalities now surpassed, the Court may now turn its attention to what is the more straightforward aspect of this case; *i.e.*, the substantive merits of Cupples' argument that he was discharged from his job because of his age, notwithstanding the sexual harassment charge. Even when the record is viewed in the light most favorable to Cupples, the only substantial evidence of discrimination is the testimony that former AmSan CEO John Muthe was looking for opportunities to "weed out" older employees because of the higher costs associated with employing them. As AmSan observes, some of this testimony concerns comments that were nearly two years removed from and wholly unconnected to Cupples' termination, and thus is of somewhat limited probative value. Yet, even assuming that Cupples could convince a jury that Muthe's alleged policy continued in the years following his separation from the company, discrimination on the basis of the *cost* of employing an older worker alone does not establish a violation of the ADEA.

Several circuits – including the Fourth Circuit – have construed the Supreme Court's holding in Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993), to stand for the proposition that terminating an

older employee for any reason that is correlated with but analytically distinct from age (including concerns over salary and health care costs) does not constitute age discrimination.[10] In this case, Cupples' evidence at most establishes that his termination – if not motivated solely by the charge of misconduct – was an economic decision motivated by a desire to reduce higher salary and health care costs associated with senior employees. The great weight of authority dictates that this is insufficient as a matter of law to prevail on an ADEA claim.[11]

Furthermore, when viewed holistically the evidence overwhelming supports the conclusion that Cupples was terminated for the very reason articulated by AmSan – his probable breach of the company's anti-harassment policy. Although Cupples denies the allegations and trumpets his

---

[10] See Denio v. Asplundh Tree Expert Co., 1996 WL 423125, at *3 (4th Cir. 1996). Accord James v. New York Racing Ass'n, 233 F.3d 149, 153 (2d Cir. 2000) ("[C]oncern with the elevated costs of senior employees does not constitute age discrimination."); EEOC v. McDonnell Douglas Corp., 191 F.3d 948, 951 (8th Cir. 1999) ("[E]mployment decisions motivated by factors other than age (such as retirement eligibility, salary, or seniority), even when such factors correlate with age, do not constitute age discrimination."); Broaddus v. Florida Power Corp., 145 F.3d 1283, 1287 (11th Cir. 1998) ("The ADEA does not prohibit an employer from making an employment decision on the basis of higher salaries, increased benefits, pension status, or claims for medical expenses even though these characteristics are often correlated with an employee's age."); Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1125-26 (7th Cir. 1994).

[11] In its own research into this issue, the Court came across an EEOC interpretive regulation to the ADEA that provides: "A differentiation based on the average cost of employing older employees as a group is unlawful [under the Act]." 29 C.F.R. § 1625.7(f). The Court need not attempt to interpret this regulation in light of the authorities cited above, since Cupples' evidence at best establishes that the cost-benefit analysis undertaken with respect to decisions to terminate senior employees was an individualized affair:

> Q: . . . [W]as it your considered opinion after having watched AmSan operate for several years that if they had the opportunity to get rid of a high salaried employee they would do it if they could find the grounds to do it?
>
> A: . . . I don't think that AmSan was looking to fire people because they made a lot of money. I don't think that was a goal. I think that they would consider what the person was doing and in their mind the value of that person and then make decisions.

(Nelson Depo. at 44:18-45:6.)

innocence, this alone is insufficient to establish foul play in the decision making process. As the Fourth Circuit explained in DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998), "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Thus, where (as here) the employer articulates a reason for the employment action which is facially nondiscriminatory, "it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Id.

A determination of how Cupples actually conducted himself toward Foure on 6 July 2004 ultimately boils down to what "he said" versus what "she said." It is for this very reason, however, that Cupples cannot possibly establish that AmSan's decision to terminate him on the basis of the harassment complaint was objectively erroneous, much less so unreasonable as to call into question AmSan's motives. Moreover, while Cupples argues that Collins could have been more exacting in his investigation by interviewing witnesses in person and following up on more leads, it should be remembered that Collins' efforts were limited by the fact that he was stationed at the company's Illinois headquarters. Under the circumstances, to question a perceived paucity in AmSan's investigative methods would amount to an impermissible substitution of the proper judicial role for that of a corporate "super-personnel department." Thus, while it may be the considered opinion of Cupples' co-workers at AmSan that Collins reached a rash or presumptuous decision to terminate Cupples upon learning of Foure's complaint, there is simply no evidence tending to show that the investigation was a mere sham designed to disguise invidious motives.

## III. Employment Discrimination – Title VII

As an alternative to age discrimination, Cupples argues that a false accusation of sexual harassment itself constitutes gender discrimination. Cf. Rico v. Autozone, Inc., 2003 U.S. Dist.

15

LEXIS 8105 (N.D. Tex. May 13, 2003); Kelman v. Woolrich, Inc., 2002 U.S. Dist. LEXIS 3589 (N.D. Ill. Mar. 5, 2002). This proposition overstates both the law as applied in this circuit and the facts of this case. As the Fourth Circuit held in Balazs v. Liebenthal, 32 F.3d 151, 155 (4th Cir. 1994), "[a]n allegation [by the plaintiff] that he was falsely accused of conduct which, if true, might have given rise to a claim of employment discrimination based on sex by [the accuser] in no way states a cause of action that plaintiff himself was a victim of discrimination based on his sex."

Even assuming that Foure's allegations of sexually inappropriate conduct were false, there is no evidence that she directed these accusations toward Cupples because he was male. At most, a jury might infer from the factual record that she falsely accused Cupples because of a personal dislike or spite, which is not gender-based animus. (Sutton Depo. at 13:3-8) (testifying that Foure once exclaimed, after watching a training video on sexual harassment, "if they make me mad, I know how to get them.")

## IV. State Law Claims (Tortious Interference and Defamation)

A claim for tortious interference with contract consists of proof of (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party not to perform the contract; (4) absence of justification; and (5) damages. Embree Construction Group, Inc. v. Rafcor, Inc., 411 S.E.2d 916, 924 (N.C. 1992). To recover under a defamation theory, a plaintiff must prove that the defendants (1) made false, defamatory statements (2) of or concerning the plaintiff, (3) which were published to a third person, (4) causing injury to the plaintiff's reputation. Tyson v. L'Eggs Products, Inc., 351 S.E.2d 834, 840 (N.C. Ct. App. 1987).

Both torts are subject to a qualified defense of privilege or justification and must fail for that

16

reason. See Smith-Price v. Charter Behavioral Health Sys., 595 S.E.2d 778, (N.C. Ct. App. 2004) (employee has "a legitimate interest in reporting any incidents of improper sexual advances or conduct to plaintiff's supervisor" that provides a qualified privilege if exercised in good faith); Embree Construction Group, 411 S.E.2d at 924 (justification to interfere with contractual relationships derives from, *inter alia*, "the social interest in protecting the freedom of action of the actor"). In light of the rights and obligations imposed by Title VII, the social interest in ensuring free and open channels of communication between an employer and its employees for the purpose of reporting and redressing suspected sexual harassment is so compelling that the Court has found no reported decision failing to recognize the availability of a privilege defense, at least in the absence of malicious and wantonly false accusations. In this case, there is no evidence supporting a conclusion that the individual defendants acted in bad faith or otherwise lacked a reasonable belief in the truth of the accusations, especially where Cupples has admitted to much of the underlying physical contact and the only dispute is a matter of perception; *i.e.*, whether it was an inappropriate pinch or an accidental bump with a briefcase.

## CONCLUSION

For the reasons stated, it is ORDERED that defendants' motions for summary judgment (Doc. Nos. 16, 19) are GRANTED. The clerk is DIRECTED to close this case.

IT IS SO ORDERED.

Signed: March 30, 2007

Frank D. Whitney
United States District Judge